UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>DORON A. TAVLIN, AFSHIN FARAHAN, and DAVID J. GANTMAN,<br><br>　　　　Defendants. | Civil Action No._____<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges as follows:

## SUMMARY OF THE ACTION

1.　This case involves unlawful insider trading by Defendants Doron A. Tavlin ("Tavlin"), Afshin Farahan ("Farahan"), and David J. Gantman ("Gantman") (collectively, "Defendants") in the securities of Mazor Robotics Ltd. ("Mazor"). While working as a Mazor executive, Tavlin was involved in discussions regarding the potential acquisition of Mazor by Medtronic PLC ("Medtronic") (the "Mazor Acquisition"). In August 2018, Tavlin tipped material nonpublic information to his friend, Farahan, regarding the Mazor Acquisition in violation of the duty of trust and confidence that Tavlin owed to Mazor. Tavlin encouraged Farahan to buy Mazor securities quickly and to invest money on Tavlin's behalf.

2.　Farahan then tipped his friend, Gantman, about the Mazor Acquisition. Over the next several weeks, Farahan and Gantman made multiple purchases of Mazor securities, including stock and call options.

1

3. On the evening of September 20, 2018, Medtronic announced its plan to acquire Mazor (the "Announcement"), and Mazor's stock price rose by 10% the next day. Farahan and Gantman realized approximately $500,000 in combined trading profits. Farahan later gave Tavlin a $25,000 kickback in exchange for the Mazor information.

4. Following the trading, Tavlin, Farahan, and Gantman took steps to conceal their illegal conduct. Months later, in response to an inquiry into potential insider trading, Tavlin concealed his relationship with Farahan and notified Farahan about the inquiry. Farahan also notified Gantman of the inquiry. During the SEC's pre-filing investigation, Gantman concealed his relationship with Tavlin.

5. By engaging in the conduct alleged in this complaint, Defendants Tavlin, Farahan, and Gantman violated the antifraud provisions of the federal securities laws, specifically, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated under the Exchange Act, 17 C.F.R. § 240.10b-5.

## JURISDICTION AND VENUE

6. The Court has jurisdiction over this action pursuant to Sections 21(d)(1), 21(d)(3)(A), 21A and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u-1 & 78aa.

7. The SEC brings this action under Section 21(d) and 21A of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78u-1. Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

8. Venue is proper in this district pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendants Gantman and Tavlin reside in this district.

2

## DEFENDANTS

9.  **Doron A. Tavlin**, age 67, resides in Minneapolis, Minnesota. Tavlin was a consultant supporting Medtronic's Ventures and Corporate Development Team between January 2016 and October 2017; was Mazor's Vice President, Business Development from October 2017 through early 2019; and is currently an executive for a medical device company.

10. **Afshin Farahan**, age 55, resides in Pacific Palisades, California, and owns and operates rug businesses in Minnesota.

11. **David J. Gantman**, age 56, resides in Mendota Heights, Minnesota, and is a licensed insurance agent and senior benefits consultant at a large insurance company.

## OTHER RELEVANT ENTITIES

12. **Mazor Robotics Ltd.** was a medical device company headquartered in Israel with a U.S. location in Orlando, Florida. Its securities were quoted on NASDAQ under the symbol, "MZOR," until December 2018, when it was acquired by Medtronic.

13. **Medtronic Public Limited Company**, is a medical technology company headquartered in Ireland, with its primary operational offices in Minneapolis, Minnesota. Medtronic's common stock is listed on the New York Stock Exchange under the symbol "MDT."

## FACTS

**A.    Background**

   **1.    Relationships Among the Defendants**

14. Tavlin and Farahan met in or around the early 2000s, when Tavlin came into Farahan's Minneapolis-area rug store and the two men discussed the fact that Tavlin knew Farahan's father. Tavlin and Farahan formed a close personal friendship over the next several years. Farahan has provided money to Tavlin's adult son at Tavlin's request, and has employed Tavlin's godchild for several years.

3

15. At all times relevant to this complaint, Farahan lived in the Los Angeles area, but traveled to Minnesota because he continued to operate rug businesses in the Minneapolis area. Tavlin resided in the Minneapolis area, but traveled to Los Angeles to visit his son. When Farahan traveled to Minnesota, he stayed at Tavlin's home, and when Tavlin traveled to Los Angeles, he stayed at Farahan's home.

16. Farahan and Gantman met in the early 1990s when Gantman came into Farahan's rug store. Their relationship grew deeper over the years, and by the early 2010s, they were close enough that Farahan gave Gantman money when Gantman was struggling financially. In or around 2011, Farahan gave Gantman approximately $10,000, and in or around 2017, he gave Gantman $5,000. In both instances, Gantman later paid him back. During their friendship, Farahan and Gantman exchanged stock trading ideas.

17. Gantman and Tavlin met through Farahan on several occasions, and at times exchanged direct e-mail correspondence.

### 2. Tavlin's Employment at Mazor and Medtronic

18. In January 2016, Tavlin signed a consulting agreement with Medtronic that outlined several services he would provide, including managing Medtronic's Israeli investments.

19. In or around May 2016, Medtronic and Mazor entered into an Exclusive Lead Sharing and Distribution Agreement. Tavlin's work for Medtronic included discussions with Mazor executives regarding the relationship between the two companies.

20. In October 2017, Tavlin left Medtronic and joined Mazor as its Vice President, Business Development reporting to its CEO. Mazor announced Tavlin's appointment to the newly created position in a press release attached to a Form 6-K filed with the SEC on October 13, 2017.

### B. Tavlin Owed a Duty of Trust and Confidence to Mazor

21. As an officer of Mazor, Tavlin owed a duty of trust and confidence to

4

the company. He was also subject to Mazor's insider trading policy, which specified that "neither an [employee] nor any of his/her relatives may buy or sell any securities of the [c]ompany or engage in any other action to take advantage of, *or pass on to others*, [material non-public information]." (emphasis added).

22. Tavlin was aware of these policies and his duty of trust and confidence to Mazor. Upon accepting his offer of employment from Mazor, Tavlin acknowledged in writing that he had received, understood and agreed to comply with Mazor's Employee Handbook, which included the insider trading policy.

**C.    The Mazor Acquisition**

23. One of Tavlin's key responsibilities as Mazor's Vice President, Business Development was "[i]dentifying and developing Business Development Activities to enrich the Mazor and Medtronic partnership." Because of his position at Mazor, he was significantly involved in discussions between Mazor and Medtronic regarding the Mazor Acquisition. In fact, in October 2018, he stated in an e-mail that he "led the Mazor transaction with Medtronic."

24. Beginning no later than January 10, 2018, Tavlin knew that information regarding the Mazor Acquisition was material nonpublic information. In addition to having already received and acknowledged Mazor's insider trading policy, Mazor's CEO e-mailed Tavlin and another Mazor executive on January 10, 2018 regarding the Mazor Acquisition, stating in his first bullet point, "[t]he process must be managed in extreme confidentiality."

25. On July 29, 2018, Mazor's CEO reported to Mazor's board of directors that he expected Medtronic executives to present a proposed transaction with Mazor to Medtronic's board of directors in August 2018.

26. On August 9, 2018, Tavlin sent Mazor's CEO an e-mail with the subject line, "Call me." In the e-mail, Tavlin explained that he had met with Medtronic's Vice President of Corporate Development, one of the primary Medtronic executives responsible for negotiating the terms of the Mazor Acquisition, and that the meeting

5

was "very important."

**D.    Tavlin Tipped Farahan in Breach of His Duty to Mazor**

27.    On Friday, August 10, 2018, Farahan flew to Minneapolis and stayed at Tavlin's home until he flew back to Los Angeles on Thursday, August 16, 2018.

28.    During his stay, Tavlin tipped Farahan that Mazor was about to be acquired, that Farahan should purchase shares quickly, and that the information was confidential.  Tavlin told Farahan he could be fired for providing Farahan with this information.  Tavlin also asked Farahan to invest in Mazor on Tavlin's behalf.

29.    At the time, Farahan knew that Tavlin was a Mazor executive.  Based on the source and nature of the information Tavlin provided to Farahan, Farahan understood that Tavlin was sharing material nonpublic information, and understood that he would be required to pay Tavlin for the Mazor information in the future.

30.    After Tavlin told Farahan about the Mazor Acquisition, but before Farahan went back to Los Angeles, Gantman visited Farahan at Farahan's rug store and the two men began discussing stocks.  Farahan told Gantman about the Mazor Acquisition.  He also told Gantman that Tavlin was the source of information, that Tavlin worked at Mazor, and that the information was confidential.  Based on his relationship with Farahan, Gantman already knew that Tavlin and Farahan were close friends.

**E.    Trading in Advance of the Mazor Announcement**

31.    Farahan placed illegal trades on the basis of the material nonpublic information that Tavlin had tipped to him.  Gantman also used the material nonpublic information he obtained from Farahan to place illegal trades.

32.    On Monday, August 13, 2018 at approximately 10:08 a.m. CST, Farahan purchased 2,000 shares of Mazor stock for $95,000.

33.    The same day, at approximately 2:39 p.m. CST, Tavlin and Farahan had a three-minute phone conversation.  Immediately following the phone conversation, at approximately 2:43 p.m. CST, Farahan purchased another 2,000 Mazor shares for

6

$93,500.

34. Two days later, on Wednesday, August 15, 2018 at approximately 9:41 a.m. CST, Gantman made a one-minute call to Farahan. Farahan called him back at approximately 11:33 a.m. CST, and the two men spoke for seven minutes.

35. A few hours later, beginning at 2:06 p.m. CST, Gantman purchased 5,000 Mazor shares for $213,850.

36. Between August 16 and September 17, 2018, Farahan continued to buy Mazor stock in his personal brokerage account and in an account in the name of one of his rug businesses. In total, he purchased $1,031,597 of Mazor stock in advance of the Announcement. He bought 15,000 shares for $702,597 using his personal account, and 7,000 shares for $329,000 using the business account.

37. Between August 17 and September 10, 2018, Gantman continued to buy Mazor securities, but instead of buying more stock, he purchased call options – betting that Mazor's stock price would go up in the near term. By doing so, he increased his chances of a bigger return if the stock price went up, but also increased the risk of losing money if Mazor's stock price did not rise enough by the time his options expired.

38. Gantman purchased options with expiration dates of September 21, October 19, and November 16, 2018, all with $50 strike prices, and all at times when Mazor stock was trading lower than $50 per share. This meant that the call options Gantman purchased were "out-of-the-money" at the time of purchase, and therefore cheaper and riskier than other options.

39. In total, Gantman purchased $287,083 worth of Mazor securities, spending $213,850 on stock and $73,233 on out-of-the-money call options.

F.   **The Announcement**

40. On September 20, 2018, at approximately 5:57 p.m. CST, Mazor announced that it had agreed to be acquired by Medtronic for $58.50 per share. The next morning, Mazor's stock price opened at $58, up more than 10% from the prior

7

day's closing price of $52.75.

41. Farahan sold all of his Mazor shares on September 21, 2018. His total trading profits were approximately $247,500, consisting of $169,503 from his personal account and $78,050 from the business account.

42. After the Announcement, Gantman sold all of the Mazor securities in his account on September 21, 2018. His total profits were approximately $255,562, consisting of $76,975 from trading Mazor stock and $178,587 from trading Mazor options.

**G.   Defendants' Efforts to Conceal Their Fraud**

    **1.   Tavlin Denies Knowing Farahan During a FINRA Inquiry**

43. On October 4, 2018 at 10:14 a.m. CST, one of Tavlin's colleagues at Mazor sent him an e-mail regarding an inquiry by the Financial Industry Regulatory Authority ("FINRA") into trading around the Announcement. The colleague informed Tavlin of the inquiry and asked him to supply his home address and additional detail about the chronology of events leading up to the Announcement.

44. Approximately six minutes later, at 10:20 a.m. CST, Tavlin called Farahan and the call lasted for four minutes. At 10:52 a.m. CST, Farahan called Gantman and the call lasted for one minute. Gantman called Farahan back at 1:45 p.m. CST, and the call lasted for one minute.

45. On December 19, 2018, FINRA provided Mazor's outside counsel with a list that included the names of certain traders who had purchased Mazor securities before the Announcement (the "Name Recognition List"), and asked that everyone who had knowledge of the Mazor Acquisition in advance of the Announcement review the list and identify anyone they knew. Both Farahan and Gantman were on the list.

46. On January 8, 2019 at 2:57 a.m. CST, Mazor's Israel-based in-house counsel sent an e-mail to designated Mazor personnel, including Tavlin, with the Name Recognition List attached. The e-mail instructed each recipient to respond,

either confirming that they knew no individuals or entities on the list or providing additional information if they did.

47. The same morning, at 10:37 a.m. CST, Tavlin called Farahan. Farahan called Tavlin back at 10:41 a.m. CST, and the two spoke for eight minutes. Tavlin told Farahan that Farahan's name was on the list, and that Tavlin did not plan on identifying him as someone he knew. Tavlin then sent Farahan the list via text or e-mail.

48. About an hour after the call with Farahan, Tavlin responded to the e-mail from Mazor's legal counsel stating that he did not have relationships with any "entities" on the list, concealing his relationship with Farahan and Gantman.

49. When Farahan reviewed the Name Recognition List, he recognized Gantman's name. He then called Gantman and informed Gantman that he was on the list.

50. On January 16, 2019, Mazor's outside counsel provided FINRA with the names of all Mazor employees who reported knowing anyone on the Name Recognition List. Tavlin's name was not included.

### 2. Farahan Gives Tavlin a Kickback for the Tip

51. In or around October 2019, during breakfast at a restaurant in Minnesota, Tavlin told Farahan he needed money and asked Farahan for money in exchange for the Mazor Acquisition information that Tavlin had provided to Farahan in August 2018. Farahan used one of his company accounts to write Tavlin a check for $25,000. The check was dated October 25, 2019, and Tavlin cashed it on October 28, 2019.

### 3. Gantman Conceals His Relationship with Tavlin

52. Gantman provided conflicting statements regarding his relationship with Tavlin. On January 27, 2021, he represented to SEC staff that he had "not had any correspondence, e-mails, or conversations with Doron Tavlin."

53. But during his March 2, 2021 testimony with the staff, Gantman

admitted that Farahan had introduced him to Tavlin, and that he had spoken with Tavlin in person several times in the past, but not for six or seven years. He went on to explain that he knew Tavlin was in the medical field because he had looked him up on LinkedIn around the time Farahan introduced them. He also stated, "I can make one thing certain to you and on the record. I never had any communications with Mr. Tavlin. So I will be very clear about that."

54. However, Gantman had in fact e-mailed Tavlin in December 2017, introducing Tavlin to another person. In the e-mail addressed to Tavlin and the other person, Gantman wrote, "[y]ou're two of my friends that will likely share some common interests and good conversation."

55. On January 28, 2022, Gantman changed his story again, representing to SEC staff that he "had no direct or indirect communication with Doron Tavlin since 2014 or prior," and "had no knowledge of Doron Tavlin's professional occupation just before or after [he] purchased Mazor stock."

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

### (Against All Defendants)

56. The SEC realleges and incorporates by reference paragraphs 1 through 55 above.

57. Tavlin learned material nonpublic information through his work as a Mazor executive. Tavlin knew or was reckless in not knowing, that the information he possessed concerning the potential acquisition of Mazor was material nonpublic information.

58. At all relevant times, Tavlin had a relationship of trust and confidence with Mazor that required him to keep nonpublic information regarding the Mazor Acquisition confidential. Tavlin knew, consciously avoided knowing, or was reckless in not knowing, that he owed Mazor a duty of trust or confidence to keep the material nonpublic information he possessed concerning the potential acquisition of

Mazor confidential. Tavlin breached that duty by tipping his close friend Farahan about the Mazor Acquisition, by encouraging Farahan to purchase Mazor securities quickly, and by asking Farahan to trade on his behalf.

59. Tavlin tipped Farahan concerning the Mazor Acquisition with the intent to benefit his close friend, Farahan. Tavlin also expected a monetary benefit from Farahan in exchange for the material nonpublic information, which Tavlin later received in the form of a $25,000 check.

60. At the time he traded in the securities of Mazor and tipped his friend Gantman, Farahan knew or was reckless in not knowing, that he was in possession of material nonpublic information.

61. Farahan also knew, consciously avoided knowing, or was reckless in not knowing, the material nonpublic information about the Mazor Acquisition that Tavlin had disclosed to him was disclosed in breach of a fiduciary duty, or similar relationship of trust and confidence.

62. Farahan tipped Gantman with the intention that Gantman would use the information to trade Mazor securities and knew, consciously avoided knowing, or was reckless in not knowing, that Gantman would trade.

63. Farahan received a personal benefit from tipping Gantman because he made a gift of information to a close friend.

64. Gantman knew or was reckless in not knowing that the information Farahan tipped to him was material and nonpublic. Gantman also knew, consciously avoided knowing, or was reckless in not knowing that the information was passed in breach of a duty or relationship of trust and confidence.

65. By engaging in the conduct described above, Defendants Tavlin, Farahan, and Gantman, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or

omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

66.     By engaging in the conduct described above, Defendants Tavlin, Farahan, and Gantman violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure permanently enjoining Defendants Tavlin, Farahan, and Gantman and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### III.

Order Defendants Tavlin, Farahan, and Gantman to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

### IV.

Order Defendants Tavlin, Farahan, and Gantman to pay a civil penalty under Section 21A of the Exchange Act, 15 U.S.C. § 78u-1.

V.

Enter an order against Defendant Tavlin pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting him from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 78 U.S.C. § 78o(d).

VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  July 6, 2022	Respectfully Submitted,

Stephen Kam (Cal. Bar No. 327576)
Sara Kalin (Cal. Bar No. 212156)
Securities and Exchange Commission
444 S. Flower St., Ste. 900
Los Angeles, CA 90071
Tel: (323) 965-3998
Fax: (213) 443-1902
kams@sec.gov
kalins@sec.gov
Attorneys for Plaintiff Securities and Exchange Commission

*/s/ Craig Baune*
Craig Baune (MN Bar No. 331727)
Assistant United States Attorney
District of Minnesota
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55414
Telephone: (612) 664-5600
Craig.baune@usdoj.gov
Local Counsel